UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No. 23-CR-0091 (NEB) |
| | ) | |
| Plaintiff, | ) | |
| | ) | **DEFENDANT'S SENTENCING** |
| v. | ) | **POSITION** |
| | ) | |
| MULATA ALI, | ) | |
| | ) | |
| Defendant. | ) | |

Mulata Ali and his sentencing are distinguished by uncontested mitigating facts,

multiple, long-recognized bases for below-guideline sentences, the passage of time, and

by the productive and commendable things that he has done in the long interval between

the end of his limited offense conduct and this moment.  The abundance of mitigation,

the absence of aggravating facts or precedent, and the person who is revealed underneath

these considerations all support a probationary sentence.

I.      Facts

Mulata Ali's offense conduct occurred at the outer periphery of what have come

to be called the Feeding Our Future cases.  As outlined below, his role was limited in

time (several months in 2021) and function (allowing his business accounts to be used by

others).  This limited role is consistent with and reinforced by the evidence of his

character and by his accomplishments over the long period between his offense and this

sentencing proceeding.  Sentencing mitigation is further supported by his childhood trauma, the diagnosis made in connection with this case, and its prognosis.

A.  History and Characteristics of Offender (18 U.S.C. § 3553(a)(1))

Mulata Ali's history, outlined in the Personal and Family Data section of the Pre-Sentence Investigation Report, is harrowing, making his survival and his accomplishments all the more significant.  Mr. Ali was born in Ethiopia, into an Oromo family of 8 children.  The war in his homeland reached his town when he was eight years old.  He was left alone with his siblings, without parents, when their mother was kidnapped, and after months in hiding he and his siblings were able to travel to Kenya, where they reunited with their father in a refugee camp.  He and his family lived in the camps for five years, and in an apartment in Nairobi for another five.  He worked as a dishwasher and laborer to help support his siblings.  School was not an option.

Mr. Ali has no history of mental health treatment or evaluation, before this case. (ECF 29, Pre-Sentence Investigation Report ("PSI") ¶ 78.)  A psychological evaluation was conducted for the first time in his life; the resulting report is filed under separate cover.  As outlined there, his work ethic followed his emigration.  (Evaluation Report at 8; PSI ¶¶ 86-90.)  He has always worked, when necessary in low-level jobs, and is proud of his ability to support himself and his children.

The report also outlines traumatic experiences that no child should face, including being the victim of assaults and witnessing killings and torture.  (*See* Evaluation Report at 4; PSI ¶¶ 78-79.)  His relatives describe him as simple and straightforward, hampered by

2

his lack of education. (PSI ¶ 74.) The evaluation takes this a step further, concluding that his trauma and limited access to education have produced a pattern of functioning in which he struggles with decisions and relies on others for advice and reassurance, creating obvious vulnerability. (Evaluation Report at 17; PSI ¶¶ 78-79.) The evaluation includes diagnoses of severe PTSD and anxiety disorder, a recommended treatment plan that focuses on trauma recovery and decision making, and an optimistic prognosis, particularly if he gets access to multi-dimensional, community-based programming. (Evaluation Report at 18.) The evaluation notes his significant strides in ending negative relationships and making proactive decisions in uncertain conditions. (Id. at 17.)

As explained below, the presence of untreated but treatable psychological conditions presents this Court with a valuable opportunity to impose a sentence that helps Mr. Ali, his family and children, and the communities of which they are a part, to do real good.

Mr. Ali has two children. This Court kindly allowed him to travel to Ethiopia and Djibouti to look after Ramadan Ali, a kindness for which he remains deeply grateful. The visit was productive and, in the time since, Ramadan has been able to immigrate to the US. Ramadan is in school and, although employed, lives with his father and depends on him entirely. Mulata's other son, Omar Ali, has relocated to the twin cities.

Mulata's circumstances remain stable. His employment has been consistent throughout the pendency of this case and the investigation that preceded it. His primary relationship is steady. His health is good.

B.  Nature and Circumstances of Offense (18 U.S.C. 3553(a)(1))

There is no dispute about the substance and limits of Mulata Ali's offense conduct.  Of the eighteen cases outlined in the Pre-Sentence Investigation Report ("PSI"), he was a minor participant in a part of one, the case summarized at ¶ 9.[1]  He had nothing to do with the extended activities summarized in the PSI's Background discussion ¶¶ 26-31, did not pay to play, or operate or claim to operate food distribution sites, or falsify or participate in the submission of meal counts or rosters.

Having been recruited, what he did was to allow access to the accounts of his legitimate business, Franklyn Transportation, by a defendant in the S & S Catering indictment docketed at 22-cr-0224.  (PSI ¶¶ 34, 37.)  These accounts were used by others to receive and distribute money, without his direct knowledge or participation, in amounts over which he had no influence.  (ECF 15, Plea Agreement, at 1-2.)

This activity happened over the course of several months in 2021.  (Id.)  Although he neither controlled nor influenced the sums that passed through his account, he and the government agree that he aided and abetted the misappropriation of $2.2 million in FNCP funds.  A separate measure of his conduct and its scope appears in the parties' agreement about restitution, which sets the proper amount at $95,099.  (Id. at 8.)   \

Mr. Ali was among the first people to be charged in this case to plead guilty and

---

[1] We do not challenge the accuracy of these summaries, but do suggest that, other than the case in Docket No. 22-0244, they are simply not relevant to the assessment of Mr. Ali and his sentencing, in particular because of the limited role he played, something to which it appears everyone agrees.  As such, we ask that Paragraphs 6-8 and 10-24 be deleted from his PSI, to avoid implying, to unsophisticated eyes in the Bureau of Prisons and beyond, that he was a bigger fish than he was in reality.

accept responsibility.  He did so without hesitation, without making excuses, and without minimizing the harm.

## II.    Analysis

In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court clarified a two-step process to be followed in federal sentencing.  The first determines the proper Guideline range for the defendant's sentence.  *See Gall*, 552 U.S. at 49 (citing *Rita v. United States*, 551 U.S. 338, 347–48 (2007)).  The second considers the factors in 18 U.S.C. § 3553(a) and whether a sentence outside that advisory range is appropriate. *See id.* at 49–50; *see also United States v. Roberson*, 517 F. 3d 990, 993 (8th Cir. 2008).

The correct calculation of a guideline range is only a starting point. *Gall*, 552 U.S. at 49.  The overarching consideration under the Sentencing Reform Act is that the sentencing court "'impose a sentence sufficient, but not greater than necessary,' to accomplish the goals of sentencing." *See Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quoting 18 U.S.C. § 3553(a)).  This Court is well familiar with Justice Kennedy's often-quoted language from *Koon v. United States* about the importance of individualized sentencing consideration at the district court level.  *See Koon v. United States*, 518 U.S. 81, 113 (1996).

Effective November 1, 2025, the Guidelines were amended to remove the discussions of the substance and procedures of sentencing departures that were mostly contained in Chapter 5.  However, these amendments are designed to be outcome-

neutral, "intending that judges who would have relied upon facts previously identified as a basis for a departure would continue to have the authority to rely upon such facts to impose a sentence outside of the applicable guideline range as a variance under 18 U.S.C. § 3553(a)." Introductory Commentary, USSG Part A. Precedent supporting downward departures therefore remains fully relevant as support for below guideline sentences, and is cited below as such.

A. Guideline Calculations

The parties agree that Mr. Ali facilitated a guideline loss figure of $2.2 million, in which he played a limited role, and that the facts support no other guideline enhancements. At the anticipated Criminal History Category of I, the Guidelines counsel a pre-variance range of 24-30 months. (Plea Agreement at 6.)

The PSI reaches a different and slightly higher calculation, based on two divergences. First, the PSI recommends the addition of the two-level enhancement outlined at USSG § 2B1.1(b)(12), fraud in connection with major disaster or emergency benefits, to which we join in the prosecution's objection. (*See* ECF 27). Second, the PSI assigns two criminal history points to a known, 2010 South Dakota controlled substance conviction, about which we join in the PSI's suggestion that this criminal history category overstates the underlying history, and that the resulting guideline range is too high. (*See* PSI ¶ 111.) Finally and most importantly, we contest the relevance of the loss-enhanced guidelines, which even with the agreed role reduction remain directly tethered to a guideline loss amount that overrepresents Mr. Ali's actual conduct.

6

1.  Fraud in connection with major disaster or emergency benefits (USSG §2B1.1(b)(12))

Though not binding on the Probation Office or the Court, the parties agree that this and the other specific offense characteristics of USSG Chapters 2 and 3 are not supported by the facts of Mr. Ali's case. Accordingly, together with the prosecution we object to the statement in Paragraph 37 that Mr. Ali's conduct constituted fraud in connection with major disaster or emergency benefits, and to the suggested conclusion in Paragraph 44 that the two-point enhancement at USSG § 2B1.1(b)(12) applies.

More substantively, this enhancement does not apply.

§ 2B1.1(b)(12) calls for an addition of two offense levels where the offense involves conduct described at 18 U.S.C. § 1040, which in turn criminalizes fraud in connection with major disaster or emergency benefits. § 1040 is specific about its prerequisites and scope. In order to violate the statute, a specific disaster or emergency declaration under specified statutory authority is required. That or a defendant that procures property or services having the particularized status of a contractor or subcontractor. 18 U.S.C. § 1040(a). None of these things are true of Mr. Ali. By its own terms, the statute does not apply here.

More generally, two programs were involved in the offense conduct that Mr. Ali's conduct facilitated, the Child and Adult Care Food Program (CACFP), and the Summer Food Service Program (SFSP). The CACFP was established through the Child Nutrition Act of 1968 and its amendments to the National School Lunch Act. (Pub. Law No. 90-302, 82 Stat. 117; *See also* Program History - National CACFP Sponsors Association). The

7

SFSP stems from the same enabling legislation, and became a separate, stand-alone program in 1978. (Id.) These programs existed, through wars and natural disasters and more, for more than 50 years before the beginning of any of the offense conduct in this collection of cases and indictments. By definition and history, they are not major disaster or emergency benefits programs.

2. Overstated criminal history

Mr. Ali reaches Criminal History Category II because of a 2010 South Dakota conviction for possession of khat, a controlled substance. (*See* PSI ¶ 57.) He also has several driving offenses. This is not a situation where a higher criminal history score results from the Probation Office's discovery of a new conviction.

Mr. Ali's offense conduct extended from March to August 2021. The sentence at issue was imposed on June 15, 2011, meaning that it was less than three months shy of being too old to count under USSG § 4A1.2(e)(2). Further, we respectfully suggest that what results is a discrepancy in both criminal history score and offense level, because this sentence costs Mr. Ali the zero-point reduction of USSG § 4C1.1, as but for this case he meets all of the requirements for that reduction. We concur with the PSI's suggestion that Category II may overrepresent the seriousness of his record, and that a sentence below the resulting range may be appropriate, for this reason alone.

3. Loss Amount (USSG § 2B1.1(b)(1))

The Guideline loss enhancement substantially overstates both Mr. Ali's culpability and the seriousness of his offense. In ways that are directly relevant to this case, courts

8

have long recognized that Guideline loss calculations can be a deeply imperfect proxy for a defendant's actual conduct, particularly in multi-defendant fraud cases. *See*, e.g., *United States v. Banks*, 55 F.4th 246, 258 n. 56 (3d Cir. 2022).  The over-inclusiveness of the loss definition that appears in the commentary to USSG § 2B1.1 has been the subject of widespread criticism.  Where, as here, large differences exist between the guideline loss calculation and the loss fairly attributable to the conduct of an individual defendant, this circumstance weakens the relevance of the enhanced guidelines as a source of insight into the proper sentence.  Here, the suggested 16-level loss enhancement very substantially overstates the extent of Mr. Ali's offense conduct, an encouraged basis for a below-guideline sentence in itself.[2]

Mr. Ali was and is not a criminal mastermind.  He was an unsophisticated businessman who allowed others to use his accounts, which they did over a period of several months, beginning five years ago.  USSG § 2B1.1(b)(1)'s loss enhancements can quickly escalate a Guidelines range, even where the gain received is modest.  Recognizing this, the Guidelines explicitly allowed for a downward departure where the loss amount "substantially overstates the seriousness of the offense."  USSG § 2B1.1, Application Note 21(C).  Particularly in multi-defendant fraud cases, courts regularly acknowledge that the loss amount applied under USSG § 2B1.1, and the resulting guideline range, can "vastly overstate[]" a defendant's true culpability.[3]

---

[2] *See, e.g., United States v. Corry*, 206 F.3d 748, 751 (7th Cir. 2000) (holding that loss overstating the seriousness of the offense is "an encouraged basis for departure"); *United States v. Lane*, 194 F.Supp. 2d 758, 775 (N.D. Ill. 2002) (same).

[3] *See United States v. Corsey*, 723 F.3d 366, 377 (2d Cir. 2013); *see also United States v. Emmenegger*, 329 F.

This is precisely such a case. Mr. Ali's conduct happened over a limited span of time in 2021. There is no evidence that he knew the full scale of the activity, and certainly none that he controlled, influenced, or even was aware of the losses caused by others that he facilitated by allowing them access to his business accounts.

In *United States v. Emmenegger*, the Court found that a below-guideline sentence was warranted where the total loss overstated the seriousness of the defendant's role. *See* 329 F. Supp. 2d at 427. Courts have similarly imposed sentences below the advisory ranges where the defendant had little control over its scope. *See, e.g., Corsey*, 723 F.3d at 380 (Underhill, concurring) (noting "the loss table of the fraud guideline alone have effectively multiplied several times the recommended sentence applicable in 1987 for large-loss frauds, which itself was set higher than historic sentences. Each of the three increases in the recommended Guideline ranges for fraud crimes was directed by Congress, without the benefit of empirical study of actual fraud sentences by the Sentencing Commission."); *United States v. Roen*, 279 F.Supp.2d 986, 990 ("because the loss determination essentially dictates the severity of the sentence, it is this determination that will almost always be the subject of departure scrutiny.")[4].

---

Supp. 2d 416, 427 (S.D.N.Y. 2004) ("The Guidelines place undue weight on the amount of loss involved in the fraud").

[4] *See also United States v. Edwards*, 595 F.3d 1004, 1010–18 (9th Cir. 2010) (holding the district court did not abuse its discretion in the course of sentencing defendant to 5 years of probation upon conviction of bankruptcy fraud and making a false statement to a bank, which varied from the Sentencing Guidelines range of 27 to 33 months incarceration, reasoning, in part, that the guidelines range, which was calculated using the intended loss, overstated the circumstances of Edwards' case).

4.  No Control Over Loss Amount

The gap between guideline loss and actual benefit thus affects both the fairness of the guideline range and its relevance as a guide to the proper sentence for Mr. Ali.  This attenuated relevance is amplified where, as here, the defendant lacked control over the loss amount their conduct facilitated.  It is uncontested that, other than providing the vehicle of his business accounts, Mr. Ali was not involved in the decisions or conduct that created the loss.  He did not participate in devising the scheme.  He did not determine the size of the sums that were deposited and withdrawn.  Accordingly, he had no influence over the events that determine the loss component of the guidelines, which the specific offense characteristic that overwhelms the offense level calculations and the resulting guideline range.

In other words, Mulata Ali lacked knowledge of, control over, or input into the loss amounts.  Punishing him for conduct outside the realm of his knowledge, control, or influence results in an unjust, arbitrary outcome, one that is untethered to his offense conduct, specifically, or to his culpability, more generally.

Sentencing below the guideline range for lack of control over the amount of economic loss has been recognized by numerous courts around the country.[5]  The First

---

[5] *See, e.g., United States v. Forchette*, 220 F. Supp. 2d 914, 925 (E.D. Wis. 2002) (departing downward because a third-party "controlled the amount of loss produced, not defendant" and explaining that a departure is proper when the defendant "may have had little or no knowledge of the amount being taken."); *United States v. Oakford Corp.*, 79 F. Supp. 2d 357, 368 (S.D.N.Y. 1999) (departing downward because "each of the defendants personally realized only a small portion of the overall gain or profits of $15 million."). *Cf. United States v. Milne*, 384 F. Supp. 2d 1309, 1312 (E.D. Wis. 2005) (departing downward for a number of reasons, despite the large loss incurred by the victims because "[w]ith their almost singular focus on loss amount, the guidelines sometimes are insufficiently

Circuit has upheld departing from the guidelines when "*[a]ny portion* of the total loss sustained by the victim [is] a consequence of factors extraneous to the defendant's criminal conduct."[6]  Analogously, a lack of control over the amount or purity of narcotics has long been recognized in the District of Minnesota and beyond as a basis for a downward departure, even before the Guidelines became advisory in January 2005.[7]  Other Districts and Circuits uphold this departure as well.[8]

    5.  Restitution

Finally, the parties here have resolved the restitution issue through a negotiated agreement capping the loss attributable to Mr. Ali at $95,099.  (Plea Agreement and Sentencing Stipulations, ECF No. 15, ¶ 14.)  This figure reflects the reality of his actual conduct and the benefit he received, not the larger Guidelines loss from the larger conspiracy.  This amount was carefully negotiated and incorporated into the plea

---

sensitive to personal culpability.").

[6] *United States v. Maldonado-Montalvo*, 356 F.3d 65, 69 (1st Cir. 2003) (quoting *United States v. Reeder*, 170 F.3d 93 (1st Cir. 1999) (emphasis added).

[7]  *See United States v. Floyd*, 738 F. Supp 1256, 1260 (D. Minn 1990) (downward departure when the amount of narcotics sold was wholly out of the defendant's control); *United States v. Batista-Segura*, 1989 WL 125838 (S.D.N.Y. 1989) (downward departure because the Guidelines give "insufficient consideration to the significance in drug offenses of a participant's lack of knowledge of or stake in the scope of a transaction, in view of the weight-driven system of grading such offenses.").

[8] *See, e.g., United States v. Mendoza*, 121 F.3d 510, 516 (9th Cir. 1997) (holding that the district court had the power "to consider a downward departure on the ground of Mendoza's lack of control over, and knowledge of, the purity of the methamphetamine he possessed for distribution."); *United States v. Chalarca*, 95 F.3d 239, 242 (2d Cir. 1996) (affirming an "offense level at the level representing the least amount of cocaine that appears in the Drug Quantity Table in the Sentencing Guidelines" because the defendant "had no knowledge of any particular quantity of cocaine and that no particular quantity was foreseeable to him."). *United States v. Jaber*, 362 F. Supp. 2d 365, 380 (D. Mass. 2005) (granting a departure because the amounts of narcotics he the defendant encountered were decided by another and that amount attributed to the defendant by the government "did not accurately reflect his culpability."

agreement. In so doing, the parties reached a meeting of the minds that $95,099 represents the appropriate restitution responsibility attributable to Mr. Ali in this case.

This sum is relevant both as the restitution figure but also as a data point for consideration of an individualized loss amount for purposes of crafting a fair and proportionate sentence under § 3553(a). The $95,099 restitution amount reflects a calculation of his actual benefit. Because of his limited involvement, and especially because of his utter lack of control over the loss his conduct facilitated, it is the appropriate benchmark for this Court's loss-related considerations. For reference, if the Court were to adopt the agreed-upon restitution figure as the operative loss amount, the applicable loss enhancement under USSG § 2B1.1(b)(1) would be +8 levels rather than +16. Applied to the PSR's base offense level of 6, and accounting for acceptance of responsibility, this would yield a total offense level of 10 and an advisory, pre-variance Zone B Guideline range of 6-12 months. Even without a role reduction, which remains appropriate even with this adjustment under Application Note 3(A), the pre-variance Zone C range would be 10-16 months. Either way, the restitution number and the limits of Mr. Ali's involvement and control show that the full Guideline loss calculation significantly overstates Mr. Ali's offense conduct and the proper measure of punishment.

B. Variances from the Advisory Guidelines

A downward variance is independently warranted under the factors set forth in 18 U.S.C. § 3553(a). This case presents several additional grounds for a sentence below the advisory Guidelines range. First, the unusually lengthy passage of time between the

offense and sentencing, during which Mr. Ali has remained offense-free and engaged in full-time employment and parenting, shows that extensive pre-sentence rehabilitation is under way and that meaningful punishment in both emotional and practical terms has already been imposed. Each of these factors supports a sentence below the advisory, pre-departure/variance Guidelines ranges of 24-30 months (guideline loss) and 6-12 or 10-16 months (restitution). His post-offense conduct over the past 5 years reinforces that continued supervision, not incarceration, is the just and appropriate outcome.

We ask the Court to conclude that Mr. Ali is the type of individual whose offense and circumstances before and after warrants mitigation. Accordingly, we respectfully request the Court impose a sentence that elevates rehabilitation over retribution, by foregoing imposing a custodial sentence and, instead, imposing a term of probation.

1. The Passage of Time

The facts that nearly five years have passed since Mr. Ali committed the offense, and that three years have passed since his plea, are unique aspects of this case. This time is significant both because of the things that Mr. Ali has done and not done in the time since the end of his involvement. It is also significant because of the punishment that it contains.

This time has not been idle or inconsequential. Importantly, Mr. Ali has not reoffended during this time. He changed his behavior, and has maintained this change, without interruption, for years. Further, he has lived for three years under the shadow of

14

this case all while working, gathering and taking care of his children, and showing the person he is.

        a.  Pre-sentence rehabilitation

A reduced sentence in this case is supported by the facts of Mulata Ali's post-offense conduct. Following earlier disagreements within and among Circuits, pre-sentence rehabilitation emerged as a widely-accepted basis for below-guideline sentences.[9] Post-offense rehabilitation has become a widely-accepted basis to impose a sentence below the advisory Guidelines range, achieving substantial reductions both through a downward departure under § 5K2.0, and as a variance from the Guidelines under 18 U.S.C. § 3553(a).[10] Reductions of many years have been affirmed in light of a defendant's rehabilitation alone.[11]

A district court judge explained the role that a defendant's post-offense conduct can play in supporting a variance, and the way such conduct impacts several factors in a district court's sentencing analysis:

> When a defendant has demonstrated extraordinary success at rehabilitation efforts, the need for incarceration is diminished. The history and characteristics of the defendant are changed. The punishment that is "just" is changed. The need for specific deterrence is lessened. The need for correctional programs such as

---

[9] *See, e.g., United States v. Shy*, 538 F.3d 933, 938 (8th Cir. 2008); *United States v. McFarlin*, 535 F.3d 808, 811 (8th Cir. 2008); *United States v. Chapman*, 356 F.3d 843, 849 (8th Cir. 2004); *United States v. Sanchez-Gonzalez*, 347 Fed.Appx. 852, 855 (3d Cir. 2009); *United States v. Martin*, 520 F.3d 87, 94 (1st Cir. 2008); *United States v. Brock*, 108 F.3d 31 (4th Cir. 1997); *United States v. Core*, 125 F.3d 74, 75 (2d Cir. 1997).

[10] *See, e.g., Shy*, 538 F.3d at 938 (affirming a sentence of probation for a drug offender with a Guidelines range of 36-46 months, based in part on post-offense rehabilitation).

[11] *See, e.g., McFarlin*, 535 F.3d at 811 (affirming a sentence of probation in the face of a Guidelines range of 97-121 months in part based on post-offense rehabilitation).

15

psychological counseling and drug rehabilitation may be negated.  The defendant's isolation and incapacitation are no longer paramount for the protection of society.
.

*United States v. Hasan*, 2009 WL 1813650, *2 (D. Neb. June 24, 2009); *see also Pepper v.*

*United States*, 562 U.S. 476, 487–88 (2011) (noting that "the punishment should fit the

offender and not merely the crime," and describing the role that post-sentencing

rehabilitation plays in determining a fair sentence).  Indeed, the Eighth Circuit remanded

a case for resentencing when the district court erroneously refused to consider the post-

offense rehabilitation of a defendant who went to trial and did not accept responsibility

for his offense, holding that "atypical post-offense rehabilitation can itself be the basis

for a departure under § 5K2.0." *Chapman*, 356 F.3d at 847–49.

The Supreme Court reemphasized the significance of rehabilitation to sentencing

in *Pepper v. United States*, 562 U.S. at 487–88.  In *Pepper*, the Court resolved a split among

the circuits in the defendant's favor, reversing the Eighth Circuit and holding that post-

sentence rehabilitation can support a below-Guidelines sentence.  *Pepper*, 562 U.S. at 487–

88.  In so doing, the Court made it clear that all rehabilitation is relevant.  In sum,

governing precedent abundantly supports below-Guidelines sentences in cases where the

accused demonstrates post-offense rehabilitation.

Here, the Court has nearly five years of post-offense conduct to consider, an

unusual and informative stretch of time.  This time period addresses an important

sentencing question - what would happen if Mulata Ali was given a sentence that elevated

rehabilitation over retribution? – for which an answer is usually not available.  It is

beyond reasonable dispute that he has moved in a positive direction in the time since his

16

offense, and that his presence among us does not threaten our collective or individual safety. Viewed together, his accomplishments reflect both considerable effort and demonstrable success. For these reasons alone, a Guidelines sentence is not supported.

b. Punishment of Uncertainty

The gap between the last offense conduct and these sentencing proceedings has carried its own kind of punishment.[12] We do not mean this as an accusation: there was no government misconduct, and some of the intervening time was occupied with pre-sentence investigation. But the passage of time and attendant uncertainty is itself punishment that the Court can—and should—consider. For Mr. Ali, the years since his offense have been marked by law-abiding achievement and by reunification with his son, but also by profound anxiety, uncertainty, and an extended period of self-reflection. To say nothing of life as a permanent resident in thew twin cities over the past months. During this prolonged pre-sentencing delay, Mulata has remained in the community, including over three years of presentence supervision. He has complied with pretrial release and lived with the slow, grinding pressure of waiting for the consequences to arrive. This is all punishment in its own right. Counsel can verify that the uncertainty of inevitable sentencing has taken a punitive toll.

Courts acknowledge that such extended uncertainty, especially when paired with post-offense rehabilitation, supports a lower sentence. Judges in this District have

---

[12] We do not mean this as an accusation: there was no government misconduct, and some of the intervening time was occupied with pre-sentence investigation. But the passage of time and attendant uncertainty is itself punishment that the Court can—and should—consider.

17

recognized that this kind of delay has real, punitive psychological weight, especially for a person already grappling with mental health needs.[13]  For Mr. Ali, this punishment has come in waves: first, in the form of waiting, and then in the knowledge that a prison term may take him away from his children who need him.  This uncertainty is its own kind of penalty.

Mr. Ali is not asking the Court to ignore what he did.  He accepts responsibility. And he recognizes that the punishment of extended uncertainty that he has experienced is self-inflicted.  He is its author.  Had he remained law-abiding, he would not have had to live with the threat of impending conviction, and then with the certainty of impending, unknown punishment.  Still, the fact that he committed the crime in no way detracts from this very real punishment.  The Court can rightly factor this preexisting punishment into its sentencing considerations.   In such settings, the question is not what modicum of punishment is sufficient, it is whether additional punishment is needed to reach the amount that is sufficient.

2.  Extraordinary Acceptance of Responsibility.

Although all agree that Mulata Ali should receive a full downward adjustment in his offense level for acceptance of responsibility, the facts support an additional reduction based upon his particular acceptance of responsibility, a degree of acceptance

---

[13] *See, e.g., United States v. Althea Jackson*, District of Minnesota Criminal Number 14-06 (PJS); *United States v. Pierson*, District of Minnesota Criminal No. 14-069 (PJS); *United States v. Turnquist*, District of Minnesota Criminal No. 14-091 (JRT) (variance to probation).

that goes well beyond the heartland of cases that routinely grant the ordinary three-level reduction.

Mr. Ali acknowledged the full extent of his offense conduct early and repeatedly. This and his conduct during the course of the investigation reflects an extraordinary degree of acceptance of responsibility. Like the lack of control over loss amount discussed above, this basis for below-guideline sentences has likewise long been recognized by the Courts.[14] Whether or not these facts find voice elsewhere, Mr. Ali's high degree of acceptance stands as an independent ground for sentencing mitigation.

The district court decision *United States v. Nguyen*, 212 F.Supp.2d 1008 (N.D. Iowa, May 17, 2002), provides a primer on this issue, chronicling the history of this variance and departure. The court notes that while acceptance of responsibility is already incorporated in the guidelines at USSG § 3E1.1, that provision does nothing to prohibit a district court from sentencing below the guideline range if the case presents circumstances that lie outside the heartland of circumstances when ordinary acceptance of responsibility is applied. *Id.*, 212 F.Supp.2d at 1018. In support of this, the court found that the sentencing commission neither proscribed nor discouraged extraordinary

---

[14] See e.g. *United States v. Byrd*, 76 F.3d 194, 197 (8th Cir. 1996); *United States v. Prince*, 204 F.3d 1021, 1023-24 (10th Cir. 2000), cert. denied; *United States v. Ceccarani*, 98 F.3d 126, 130-31 (3rd Cir. 1996); *United States v. McDonald*, 22 F.3d 139, 144 (7th Cir 1994); *United States v. Pace*, 17 F.3d 341, 343 (11th Cir. 1994); *United States v. O'Neil*, 936 F.2d 599, 600-01 (1st Cir. 1991; *United States v. Watkins*, 911 F.2d 983, 984-85 (5th Cir. 1990). Other Cases that discuss extraordinary acceptance of responsibility include: *United States v. Simpson*, 7 F.3d 813, 819 (8th Cir. 1993) (recognizing but not applying extraordinary acceptance of responsibility as basis for downward departure); *United States v. Desormeaux*, 952 F.2d 182, 185-86 (8th Cir. 1991); *United States v. Garlich*, 951 F.2d 161, 164 (8th Cir. 1991); *United States v. Whitehorse*, 909 F.2d 316, 319 (8th Cir. 1990).

acceptance of responsibility elsewhere in the guidelines, so long as the particular

circumstances at hand are truly exceptional and thus outside the heartland of typical

cases. *Id.*, 212 F.Supp.2d at 1019-23.

Thus, the question for the Court is whether Mr. Ali's circumstances are

sufficiently outside the heartland of cases when ordinary acceptance of responsibility is

granted. Typically:

> [T]he heartland of cases in which reduction are calculated pursuant to Section
> 3E1.1 consists of a fairly predictable set of facts. They are cases in which a
> defendant admits the factual basis of his or her own conduct that comprises the
> elements of the charged offense, genuinely recognizes his or her guilt, pleads
> guilty, and charges his or her plea sufficiently prior to trial so that the government
> is able to avoid preparing for trial.

*Id.*, 212 F.Supp.2d at 1023-1025.

The parties and Probation Office agree that Mr. Ali's conduct during the course of

her case merits ordinary acceptance of responsibility per USSG § 3E1.1. (PSI ¶¶ 40-41.)

What takes him outside the heartland is his post-offense conduct and the depth of his

understanding of the consequences of his actions and of his remorse. These include his

confession and post-offense conduct.

Ultimately, his acceptance of responsibility goes well beyond that ordinarily seen.

Accordingly, a below-guideline sentence based upon extraordinary acceptance of

responsibility on grounds that the particular circumstances of this case exhibit conduct

that goes beyond the heartland of typical acceptance of responsibility requirements.

20

3. Collateral Consequences

Mr. Ali's immigration status and the potential impact that sentencing can have on it also bear consideration. As a theft-related offense, Mr. Ali's present conviction will qualify as an aggravated felony under the immigration code, if the sentence imposed is one year or more.[15] In addition, a single aggravated felony conviction renders the defendant deportable.[16] There is no discretion: deportation is mandatory "upon the order of the Attorney General."[17]

This legal reality lends additional support to a sentence under the loss guidelines, one consistent with the restitution-driven offense level and range. Mr. Ali's accomplishment in reuniting with his son, under his legal status, is real, but his son's recent arrival and more make him vulnerable. As is his father. A sentence of less than a year will avoid an immigration consequence that to date none have supported.

4. Elevating Rehabilitation Over Retribution

Finally, Mr. Ali's circumstances support a sentence that elevates rehabilitation over retribution. As discussed above, in addition to medical diagnoses that are currently being treated effectively and successfully in the community (*see* PSI ¶ 77), the psychological evaluation's diagnosis of PTSD and its inclusion of treatment recommendations and a positive prognosis are significant. Although the trauma dates to abuse he experienced as

---

[15] 8 U.S.C. § 1101 (a)(43)(g) ("The term 'aggravated felony' means … a theft offense (including receipt of stolen property) or burglary offense for which the term of imprisonment [is] at least one year").

[16] 8 U.S.C. § 1227 (a)(2)(A)(iii) ("Any alien who is convicted of an aggravated felony at any time after admission is deportable.")

[17] 8 U.S.C. § 1227 (a).

21

a child in refugee camps, this evaluation was his first, and the diagnosis is new. The recommendations present an opportunity to intervene that has not existed before.

This opportunity does not exist in a vacuum. Mr. Ali's scrupulous compliance with his supervision conditions, his employment, and his attention to the responsibilities and opportunities of parenthood all reveal him to be someone upon whom the opportunity of treatment would not be wasted.

**Conclusion**

Mulata Ali's life has been shaped by trauma, yet he has demonstrated resilience and a genuine desire to do right. He accepts responsibility for his actions, acknowledges the harm caused, and is committed to using this opportunity to continue to build a better future for himself and his family.

A period of probation is both sufficient and not greater than necessary to achieve the goals of sentencing under 18 U.S.C. § 3553(a). Supervision is punishment - the Supreme Court recognized the punitive nature of supervision in *Johnson v. United* States, 529 U.S. 694, 700-01 (2000). Here, a probationary sentence appropriately accounts for the limitations of Mr. Ali's offense conduct, the punishment already imposed, the significant trauma of his past, and the opportunity for rehabilitation that this presents. If an additional consequence is needed, community service is available.

The Court has a chance to do some real good. We encourage the Court to elevate rehabilitation, and to impose a probationary sentence with conditions that support it.

22

DATED: April 14, 2026              Respectfully submitted,

                                   GOETZ & ECKLAND P.A.


                                        */s Andrew H. Mohring*
                            By: _____
                                   ANDREW H. MOHRING
                                   Attorney Registration No. 190731

                                   FREDERICK J. GOETZ
                                   Attorney Registration No. 185425
                                   Banks Building
                                   615 1st Avenue NE, Suite 425
                                   Minneapolis, MN 55413
                                   (612) 874-1552

                                        *Attorneys for Mulata Ali*

23